**C.A. Goldberg, PLLC**
Hannah Meropol (CA Bar No. 340095)
hannah@cagoldberglaw.com
16 Court St., 33rd Floor
Brooklyn, NY 11241
T: (646) 666-8908
*Attorney for Plaintiff Seanne Murray*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEANNE MURRAY, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MARIO DIEL, an individual; and IKAR HOLDINGS LIMITED, a UK company,<br><br>Defendants. | **Case. No.:** 2:22-cv-07473 SB (KSx)<br><br>**PLAINTIFF SEANNE MURRAY'S MOTION FOR DEFAULT JUDGMENT**<br><br>Date: July 14, 2023<br>Time: 8:30am |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2

PLEASE TAKE NOTICE that, on July 14, 2023, at 8:30am, or as

3

soon as the matter may be heard thereafter, Plaintiff SEANNE MURRAY

4

moves this Court for an order entering a default judgment against Defendant

5

IKAR HOLDINGS, LIMITED, a UK company, and awarding Plaintiff

6

compensatory and punitive damages and attorneys' fees.

7

This motion is made pursuant to Fed. R. Civ. P. 55(b). The Court should

8

grant the instant motion and award Ms. Murray compensatory damages,

9

punitive damages, and attorneys' fees, because she has satisfied the

10

procedural requisites for the entry of a default judgment against IKAR and the

11

*Eitel* factors weigh in her favor.

12

This motion is based upon the Memorandum of Points of Authorities

13

submitted herein, all accompanying Declarations and Exhibits, the First

14

Amended Complaint and other documents filed in this action, any matters of

15

which this Court may properly take judicial notice, and oral argument heard

16

by this Court.

17

18

Dated: June 6, 2023

19

**C.A. Goldberg, PLLC**

20

By:     /s/ *Hannah Meropol*

21

Hannah Meropol, CA Bar No. 340095

22

*Attorney for Plaintiff Seanne Murray*

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION AND PROCEDURAL BACKGROUND .................. 1

ARGUMENT ........................................................................................ 2

  I.  **Ms. Murray satisfies the procedural requirements of FRCP 55 and L.R. 55-1** ......................................................................................... 2

  II. **The *Eitel* Factors Favor Granting Default Judgment** ....................... 3

    A. **Factor 1: Ms. Murray would be prejudiced by a denial of her motion for default judgment** ..................................................... 3

    B. **Factors 2 and 3: Ms. Murray has sufficiently pleaded her claims** 4

      i.  Ms. Murray exhausted administrative remedies required by law ...... 4

      ii.  Ms. Murray states a claim for sexual harassment under FEHA ........ 5

      iii. Ms. Murray states a claim for retaliation under FEHA ..................... 8

      iv. Ms. Murray was an IKAR employee for the purpose of her Title VII claims ................................................................................. 11

      v.  Ms. Murray states a claim for sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ................................................. 12

      vi. Ms. Murray states a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964 ..................................................... 12

    C. **Factor 4: Plaintiff requests a reasonable sum of money** ............... 13

      i.  Backpay ................................................................................. 13

      ii.  Emotional distress ................................................................. 16

      iii. Punitive damages ................................................................... 18

      iv. Attorney's fees ...................................................................... 21

    D. **Factor 5: There is little possibility of a dispute concerning material facts** ................................................................................. 23

    E. **Factor 6: IKAR's default was not due to excusable neglect** ......... 23

F. Factor 7: A decision on the merits is impossible given IKAR's failure to respond or appear in this matter .................................... 24

CONCLUSION ........................................................................... 24

# **TABLE OF AUTHORITIES**

**Cases**

*Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781 (N.D. Cal. 2015). .......... 20

*Adcock v. Chrysler Corp.*, 166 F.3d 1290 (9th Cir. 1999). .......................... 11

*Ahlmeyer v. Nevada Sys. of Higher Educ.*,
   555 F.3d 1051 (9th Cir. 2009)................................................ 16, 18

*Alabado v. French Concepts, Inc.*, No. CV15-2830 FMP (AJWx),
   2016 WL 5929247 (C.D. Cal. May 2, 2016). ................................ passim

*Andrade v. Arby's Restaurant Group, Inc.*,
   225 F.Supp.3d 1115 (N.D. Cal. 2016). ........................................ passim

*Danning v. Lavine*, 572 F.2d 1386 (9th Cir. 1978). ...................................... 4

*Day v. Sears Holding Corp.*, 930 F.Supp.2d 1146 (C.D. Cal. 2013). ........ 8, 9

*Doe v. Kijakazi*, No. 5:22-cv-00744-RGK-MW,
   2023 WL 2628064 (C.D. Cal. 2023)..................................................... 12

*E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994). ....................... 21

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986)............................................ 3

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002). ..................... 4

*Flores v. City of Westminster*, 873 F.3d 739 (9th Cir. 2017). ...................... 9

*Fonsecas v. Sysco Food Servs. of Arizona, Inc.*,
   374 F.3d 840 (9th Cir. 2004)................................................................ 10

*Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843 (2019). .......................... 4

*Gentile v. Cohodes*, No. A161721,
   2021 WL 4946964 (Cal. Ct. App. Oct. 21, 2021). ................................ 21

*Gotthardt v. National R.R. Passenger Corp.*,
   191 F.3d 1148 (9th Cir. 1999)............................................................. 13

*Henry v. Adventist Health Caste Medical Center*,
   970 F.3d 1126 (9th Cir. 2020)............................................................. 11

*Hicks v. Netflix, Inc.*, 472 F.Supp.3d 763 (C.D. Cal. 2020). ................... 9, 10

*Iwekaogwu v. City of Los Angeles*, 75 Cal.App.4th 803 (1999). ................. 18

*Kilroy v. Los Angeles Unified Sch. Dist. Bd. Of Education*,

    No. CV 13-6373-DMG (FFMx), 2013 WL 12474266

    (C.D. Cal. Sept. 24, 2013). ....................................................... 13

*Kiwijet, LLC v. Air Safa PTE, LTD*, No. 2:21-cv-09312-SB-AFM,

    2022 WL 3013104 (C.D. Cal. May 31, 2022). ......................... 2, 3

*Kohler v. Inter-Tel Technologies*, 244 F.3d 1167 (9th Cir. 2001). ............... 12

*McRae v. Dep't of Corrections & Rehabilitation*,

    142 Cal.App.4th 377 (2006) .................................................... 10

*Mize–Kurzman v. Marin Cmty. Coll. Dist.*, 202 Cal.App.4th 832 (2012). .. 14

*Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) ..................... 22

*Moyo v. Gomez*, 40 F.3d 982 (9th Cir.1994). …………………………9

*Murillo v. Rite Stuff Foods, Inc.*, 65 Cal.App.4th 833 (1998). ..................... 17

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ......................... 11

*Notorious B.I.G. v. Yes. Snowboards*, No. CV 19-1946-JAK (KSx),

    2020 WL 6154195 (C.D. Cal. Sept. 18, 2020) ......................... 22

*Partners for Health and Home, L.P. v. Seung Wee Yang*,

    488 B.R. 431 (C.D. Cal. 2012) ................................................. 22

*PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172 (C.D. Cal. 2022) ........ 2

*Pierce v. County of Orange*, 905 F.Supp.2d 1017 (C.D. Cal. 2012) ............ 22

*Randall v. Automatic Data Processing Inc.*, No. 5:21-cv-01223-JWH-KKx,

    2022 WL 843460 (C.D. Cal. Mar. 21, 2022). ........................... 6

*Rasheed v. Foxx*, No. CV 14-7586 PSG (JPRx),

    2016 WL 11745986 (C.D. Cal. Jun. 4, 2016). ......................... 13

*Rosenstock v. Los Angeles Unified School District*, No. CV08-6401-JWJ,

    2009 WL 10675045 (C.D. Cal. Jul. 23, 2009). ......................... 8

*State Dep't of Health Servs. v. Superior Court*, 31 Cal.4th 1026 (2003). ...... 6

*Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128 (1998). ......................... 21

*Woodhouse v. United States Government*, No. 2:22-cv-00079-RGK,

    2022 WL 17222248 (C.D. Cal. Aug. 16, 2022). .................................... 21

*Wysinger v. Automobile Club of Southern California*,

    157 Cal.App.4th 413 (2007). ....................................................................... 21

*Zucchella v. Olympusat, Inc.*, No. CV 19-7335-DSF (PLAx),

    2020 WL 2334118 (C.D. Cal. Feb. 27, 2020). ......................................... 5

## <u>Statutes</u>

42 U.S.C. § 1981a(a)(1). ................................................................... 16, 18

42 U.S.C. § 1981a(b)(1). ......................................................................... 19

42 U.S.C. § 2000e *et seq.* ................................................................. passim

42 U.S.C. § 2000e-5(k). .......................................................................... 21

50 U.S.C. § 3931 ................................................................................... 2, 3

Cal. Civ. Code § 3294(a). ....................................................................... 18

Cal. Civ. Code § 3294(b). ....................................................................... 19

Cal. Civ. Code § 3294(c)(1). ................................................................... 19

Cal. Civ. Code § 3294(c)(2). ................................................................... 19

Cal. Gov. Code § 12900 *et seq.* ......................................................... passim

Cal. Gov. Code § 12923(b). ...................................................................... 6

Cal. Gov. Code § 12940(h). ...................................................................... 8

Cal. Gov. Code § 12940(j)(1). ................................................................ 5, 6

## <u>Rules</u>

C.D. Cal. Civ. Local Rule 55-1 .................................................................. 2

Fed. R. Civ. P. 5(b)(2)(C). ......................................................................... 3

Fed. R. Civ. P. 55 ....................................................................................... 2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Seanne Murray ("Ms. Murray") brings this motion for a default judgment against Defendant IKAR Holdings Limited, a UK company ("Defendant" or "IKAR"). The Court should grant the instant motion and award Ms. Murray compensatory damages, punitive damages, and attorney's fees, because she has satisfied the procedural requisites for the entry of a default judgment against IKAR and the *Eitel* factors weigh in her favor.

In January 2022, IKAR hired Ms. Murray as the CEO of IKAR Sports & Entertainment. First Amended Complaint, Dkt. No. 12 (hereinafter "FAC"), ¶¶ 3, 19. Ms. Murray was hired pursuant to a consulting agreement between IKAR, herself, and Attain 9, Ms. Murray's consulting company. *Id.* ¶¶ 19-20. *See also* Agreement, attached as *Exhibit A* to Declaration of Plaintiff Seanne Murray in Support of her Motion for Default Judgment ("Murray Decl."). Ms. Murray was supervised in her work for IKAR by Mario Diel ("Mr. Diel"), IKAR's Founding Chairman and CEO. *FAC* ¶¶ 3, 24.

During a business trip in Los Angeles on April 25, 2022, Mr. Diel subjected Ms. Murray to repeated unwanted verbal and physical sexual advances despite her consistent rebuffs. *Id.* ¶¶ 31-40. The following day, Mr. Diel was hostile towards Ms. Murray, which she attributed to her rejection of his advances. *Id.* ¶¶ 44-47. In May 2022, Ms. Murray reported Mr. Diel's harassing behavior to two IKAR executives, but she is unaware of any investigative or corrective action taken in response to her complaints. *Id.* ¶¶ 50, 53-54. Murray Decl. ¶ 11.

Less than three weeks later, on June 2, 2022, IKAR terminated its employment relationship with Ms. Murray, accusing her of making "false

statements and accusations" "with a false motivation of defaming and calumniating IKAR and its top management." *FAC* ¶ 57. <u>Termination Letter</u>, attached as *Exhibit C* to Murray Decl. IKAR has refused to compensate Ms. Murray for her work already completed. *FAC* ¶ 61.

Ms. Murray commenced this action on October 13, 2022, Dkt. No. 1, and filed the FAC on October 18, 2022. She brings four causes of action against IKAR: sexual harassment in violation of the California Fair Employment and Housing Act, Cal. Gov. Code § 12900 *et seq.* ("FEHA"), retaliation in violation of FEHA, sexual harassment in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* ("Title VII"), and retaliation in violation of Title VII.

Ms. Murray obtained an entry of default against IKAR on May 16, 2023. Dkt. No. 26. She now seeks a default judgment against IKAR.

**ARGUMENT**

**I.    Ms. Murray satisfies the procedural requirements of FRCP 55 and L.R. 55-1**

"Before a court may rule on a motion for default judgment, it must first determine whether the motion complies with Federal Rule of Civil Procedure 55 and Local Rule 55-1." *Kiwijet, LLC v. Air Safa PTE, LTD*, No. 2:21-cv-09312-SB-AFM, 2022 WL 3013104, at *1 (C.D. Cal. May 31, 2022) (citing *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172, 1175 (C.D. Cal. 2022)). Specifically, a plaintiff seeking a default judgment must state "(1) when and against which party the default was entered; (2) the identification of the pleading to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is adequately represented; (4) that the Servicemembers Civil Relief Act (50 U.S.C. § 3931) does not apply; and (5) that notice of the application has been served on the defaulting party (if required)." *Id. See also* L.R. 55-1.

Ms. Murray satisfies these procedural requirements. First, Ms. Murray obtained an entry of default against IKAR on May 16, 2023, Dkt. No. 26. Declaration of Hannah Meropol in Support of Plaintiff Seanne Murray's Motion for Default Judgment ("Meropol Decl.") ¶ 3. Second, the default was entered as to the FAC, which was served on IKAR along with the summons on April 4, 2023. *Id.* Third, IKAR is neither an infant nor an incompetent person. *Id.* ¶ 4. Fourth, 50 U.S.C. § 3931 does not apply to this action. *Id.* Fifth, Plaintiff served IKAR with the Request for Entry of Default, Dkt. No. 23, as well as the instant motion, by mail pursuant to Fed. R. Civ. P. 5(b)(2)(C). *Id.* ¶ 5.

## II. The Eitel Factors Favor Granting Default Judgment

In *Eitel v. McCool*, the Ninth Circuit identified seven factors that courts assess when considering whether to exercise its discretion to grant a motion for default judgment: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." 782 F.2d 1470, 1471-72 (9th Cir. 1986). Ms. Murray addresses each of the *Eitel* factors in turn:

### A. Factor 1: Ms. Murray would be prejudiced by a denial of her motion for default judgment

Where a defendant has failed to respond or appear in an action, a plaintiff will be prejudiced unless a default judgment is entered in her favor. *Kiwijet*, 2022 WL 3013104, at *2. Prejudice will result because, absent the entry of default judgment, the plaintiff "would be denied the right to judicial resolution of the claims presented, and would be without other recourse for recovery." *Alabado v. French Concepts, Inc.*, No. CV15-2830 FMP (AJWx),

2016 WL 5929247, at *4 (C.D. Cal. May 2, 2016) (internal quotation marks and citations omitted).

IKAR has not responded to Ms. Murray's First Amended Complaint, nor has it otherwise appeared in this matter. A denial of Ms. Murray's motion for default judgment will result in a windfall to IKAR at Ms. Murray's expense, as she will not be compensated for the unlawful injuries IKAR caused her. Such an outcome would be prejudicial to her; therefore, the first *Eitel* factor weighs in favor of an entry of default judgment against IKAR.

**B. Factors 2 and 3: Ms. Murray has sufficiently pleaded her claims**

The second and third *Eitel* factors "are often analyzed together." *Alabado*, 2016 WL 5929247, at *4 (internal quotation marks and citations omitted). For this analysis, "well-pled allegations in the complaint regarding liability are deemed true," *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002), and a plaintiff need only "state a claim on which [she] may recover." *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

Ms. Murray has sufficiently pled each of her four causes of action against IKAR such that the second and third *Eitel* factors weigh in favor of the entry of a default judgment against IKAR.

**i. Ms. Murray exhausted administrative remedies required by law**

Ms. Murray filed charges of sexual harassment with the California Department of Fair Employment and Housing ("DFEH") on October 11, 2022, and DFEH issued Ms. Murray a Notice of Right to Sue the same day. *FAC* ¶ 6. Murray Decl. ¶ 27.

Title VII's charge-filing instruction is not jurisdictional, but instead a claim processing rule subject to waiver if not timely raised by a defendant. *Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843 (2019). IKAR failed to

respond or appear in this matter and thus did not raise the issue of Title VII administrative exhaustion prior to the entry of default. Moreover, Ms. Murray filed a charge of discrimination alleging harassment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC") on July 5, 2022, which issued her right to sue on January 11, 2023. Murray Decl. ¶ 28.

### ii. Ms. Murray states a claim for sexual harassment under FEHA

As a threshold matter, claims of harassment under the FEHA apply to both employees and independent contractors. *See* Cal. Gov. Code § 12940(j)(1) (extending the anti-harassment provision's protections to "a person providing services pursuant to a contract"); *See also Zucchella v. Olympusat, Inc.*, No. CV 19-7335-DSF (PLAx), 2020 WL 2334118, at *7 (C.D. Cal. Feb. 27, 2020) ("claims of harassment under California Government Code section 12940 do apply to independent contractors.").

Here, Ms. Murray contracted with IKAR on January 3, 2022 to serve as CEO of IKAR Sports and Entertainment, and later was appointed as CEO of IKAR Hera. *FAC*, ¶¶ 3(b), 19, 22. According to her Agreement with IKAR, Ms. Murray's services were to include "management of the overall operations and resources of the Company, acting as the main point of communication between the Management Board of IKAR Holdings and corporate operations; and [additional] services ser forth under Schedule A of [the] Agreement." Agreement p. 3. Regardless of whether the Court determines that Ms. Murray was an employee or a person who provided services pursuant to a contract with IKAR, she is entitled to protection from sexual harassment under FEHA.

To state a claim for a hostile work environment under FEHA, *see* Cal. Gov. Code § 12940(j)(1), a plaintiff must allege the following elements: "(1)

5

the plaintiff belongs to a protected group; (2) the plaintiff was subjected to unwelcome harassment because of being a member of that group; and (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Randall v. Automatic Data Processing Inc.*, No. 5:21-cv-01223-JWH-KKx, 2022 WL 843460, at *3 (C.D. Cal. Mar. 21, 2022) (internal quotation marks and citations omitted). "Where a supervisor is the harasser, the employer is strictly liable." *Andrade v. Arby's Restaurant Group, Inc.*, 225 F.Supp.3d 1115, 1130 (N.D. Cal. 2016) (citing *State Dep't of Health Servs. v. Superior Court*, 31 Cal.4th 1026, 1042 (2003)).

First, Ms. Murray belongs to a protected group because she is a woman alleging harassment based on sex, which is expressly prohibited by FEHA's harassment provision, Cal. Gov. Code § 12940(j)(1). *FAC* ¶ 64. Second, Ms. Murray alleges that she was subjected to unwelcome harassment because of her sex on April 25, 2022, when her supervisor Mario Diel repeatedly subjected her to unwanted verbal and physical sexual advances, despite her consistent rejections of him. *Id.* ¶¶ 30-40.

Third, Ms. Murray makes allegations that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Importantly, "a single incident of harassing conduct is sufficient… if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." Cal. Gov. Code § 12923(b).

Here, Ms. Murray alleges that during an April 2022 business trip in Los Angeles, Mr. Diel made repeated statements to her "that he would marry her if her was not already married," told "raunchy stories about past sexual exploits," and "told her that he wanted to have sex with her." *FAC* ¶¶ 31, 33-

34. She alleges that Mr. Diel then "grab[bed] Ms. Murray's hand and []
began rubbing her arm. *Id.* ¶ 35. She further alleges that when she rejected
his sexual advances by telling "him no multiple times, Mr. Diel continued to
force eye contact with Ms. Murray, attempting to cajole her into being
physically intimate with him." *Id.* ¶ 35. Ms. Murray alleges that Mr. Diel's
conduct caused her to fear for her safety, and she responded by attempting
"to extricate herself from the situation" by leaving and calling a Lyft to
return to her hotel. *Id.* ¶ 36. Disregarding her clear attempts to reject his
advances, Ms. Murray alleges that Mr. Diel followed her outside, "and when
her car arrived, Mr. Diel attempted to enter the vehicle with her, despite not
having been invited to do so. Ms. Murray squeezed past Mr. Diel in order to
enter her vehicle, as he protested not being allowed to join, with his hand on
top of the car door to prevent it from closing." *Id.* ¶¶ 37-38. She alleges that
although Mr. Diel "finally relented" and she was able to return to her hotel,
upon arriving at her hotel "she received a suggestive text message from Mr.
Diel implying that he wanted to spend the night with her," and leaving her
"[f]eeling shaken and violated." *Id.* ¶¶ 39-40.

These allegations are akin to those in *Andrade*, in which the court
found allegations of sexual harassment sufficiently severe or pervasive to
sustain a FEHA hostile work environment claim where the plaintiff alleged
that her supervisor asked her out on dates despite her rejections and
subjected her to unwanted touching. 225 F.Supp.3d at 1129.

Though these allegations alone convey how Mr. Diel's conduct, as
Ms. Murray's supervisor at IKAR, created an intimidating and offensive
working environment, Ms. Murray further alleges that the following day,
Mr. Diel suddenly began to act "aggressively" towards her, "suggesting that
he wanted to take half of Ms. Murray's business for free,… implying that
Ms. Murray owed him, and regaling her with stories about how he has

manipulated other people he works with." *Id.* ¶ 44-45. Ms. Murray alleges that Mr. Diel's treatment of her, which she "directly attributed to… her refusal of his sexual advances," made her feel "fearful," "extremely shaken and emotionally affected." *Id.* 45-47.

These allegations also support a claim of quid pro quo sexual harassment, another theory of liability for sexual harassment claims under FEHA for which a plaintiff must allege that "a term of employment [was] conditioned upon submission to unwelcome sexual advances." *Day v. Sears Holding Corp.*, 930 F.Supp.2d 1146, 1179 (C.D. Cal. 2013). "The plaintiff… need merely show that she refused sexual advances and was retaliated against." *Rosenstock v. Los Angeles Unified School District*, No. CV08-6401-JWJ, 2009 WL 10675045 (C.D. Cal. Jul. 23, 2009).

Through her allegations regarding Mr. Diel's hostile conduct following her refusal of his sexual advances, Ms. Murray adequately alleges quid pro quo sexual harassment. A quid pro quo theory of liability is also supported by Ms. Murray's allegation that the following month, in May 2022, when she invoiced IKAR for her work per her consultancy Agreement, Mr. Diel refused to pay her. *FAC* ¶¶ 484-9. Ms. Murray alleges that she was concerned his "refusal to pay was directly related to her rebuff of his sexual advances," which prompted her to report the harassment to IKAR leadership. *Id.* ¶ 50.

Accordingly, Ms. Murray has sufficiently pleaded the elements of her FEHA sexual harassment claim, under either a hostile work environment or quid pro quo theory of liability.

### iii. Ms. Murray states a claim for retaliation under FEHA

FEHA prohibits retaliation for opposing "any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov. Code § 12940(h). To

state a retaliation FEHA claim, a plaintiff must allege "(1) she engaged in protected activity, (2) the employer subjected her to an adverse employment action, and (3) there is a causal link between the protected activity and the employer's action." *Hicks v. Netflix, Inc.*, 472 F.Supp.3d 763, 771 (C.D. Cal. 2020) (internal quotation marks omitted).

First, Ms. Murray alleges that she engaged in protected activity when she reported Mr. Diel's harassing conduct towards her in Los Angeles to both Keith Thurgood, the Group CEO at IKAR, and John Mehas, the Chair of IKAR's Board, including through an email on May 17, 2022 that provided "a detailed written account of everything that had transpired." *FAC* ¶¶ 50, 53-54. It does not matter whether her complaint actually involves discriminatory conduct violating FEHA. *See Day*, 930 F.Supp.2d at 1179 (a complaint about sexual harassment is protected activity for the purposes of a FEHA retaliation claim "when the employee opposes conduct that the employee reasonably and in good faith believes to be [in violation of FEHA], whether or not the challenged conduct is ultimately found to violate the FEHA.")[1].

Second, "California defines adverse employment actions as those 'materially affect[ing] the terms, conditions, or privileges of employment.'" *Hicks*, 472 F.Supp.3d at 775 (quoting *Flores v. City of Westminster*, 873 F.3d 739, 748 (9th Cir. 2017)). Ms. Murray alleges that IKAR subjected her to an adverse employment action when, on June 2, 2022, she learned that "that IKAR was terminating its relationship with" her and refused to compensate her for work already completed. *FAC* ¶¶ 57, 61. *Andrade*, 225

---

[1] For the same reason, Ms. Murray states a claim for retaliation even if she had failed (though she has not) to allege the requisite relationship between herself and IKAR to be protected by FEHA. *See also Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir.1994) (as amended) ("[R]egardless of whether the inmates in this case actually qualified as employees, [plaintiff] would be able to state a retaliation claim if he could show that his belief that an unlawful employment practice occurred was 'reasonable.'").

9

F.Supp.3d at 1136 (finding plaintiff's "termination was an adverse employment action" in the context of a FEHA retaliation claim). *Fonsecas v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) ("[A]n adverse employment action exists where an employer's action negatively affects its employee's compensation.").

Third, Ms. Murray sufficiently alleges a causal link between her reports of Mr. Diel's sexual harassment and her termination without compensation. The required causal link may be satisfied through alleging "'nothing more than [the defendant employer's] knowledge that [the plaintiff] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Hicks*, 472 F.Supp.3d at 778 (quoting *McRae v. Dep't of Corrections & Rehabilitation*, 142 Cal.App.4th 377, 388 (2006)).

Here, Ms. Murray alleges that she engaged in protected activity in May 2022 when she reported Mr. Diel's sexually harassing behavior to Mr. Thurgood and Mr. Mehas, including through email on May 17, 2022. *FAC* ¶¶ 50, 53-54. She alleges that IKAR terminated her employment on June 2, 2022, less than three weeks later. *Id.* ¶ 57. The close temporal proximity between her protected activity and the adverse employment action provides circumstantial evidence giving rise to an inference of a causal relationship between them. *Id.* ¶ 59. *See Hicks*, 472 F.Supp.3d at 778 ("There is no bright-line rule about timing and, depending on the circumstances, even three to eight months from the time of the alleged protected activity to the time of the alleged retaliatory action can support an inference of retaliation.").

Accordingly, Ms. Murray has sufficiently pleaded her FEHA retaliation claim.

### iv. Ms. Murray was an IKAR employee for the purpose of her Title VII claims

Although Title VII protections only apply to employees, not independent contractors, *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999), the Court should find that Ms. Murray was an IKAR employee for the purpose of her Title VII claims. To decide whether an individual is an employee, courts assess "the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). The Ninth Circuit, *Henry v. Adventist Health Caste Medical Center*, 970 F.3d 1126, 1130 (9th Cir. 2020), instructs that courts consider the following factors from the *Darden* decision: "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

Plaintiff concedes that some aspects of her employment with IKAR weigh against the finding that she was an employee: Ms. Murray worked remotely, *FAC* ¶ 25, and her consultancy Agreement stated that it was a "contract for the provision of services and not a contract of employment." Agreement p. 7. Ms. Murray was responsible for her "own tax and social security liabilities" *id.*, and did not receive health insurance benefits through IKAR. Murray Decl. ¶ 4.

However, the other factors weigh in favor of finding that Ms. Murray was an IKAR employee. The Agreement does not specify a duration; it was

indefinite. *See generally* <u>Agreement</u>. Mr. Diel, who supervised Ms. Murray through daily communications, assigned her additional responsibilities over the course of her employment that were not described in the Agreement, including appointing her as CEO of IKAR Hera which involved substantial additional responsibilities. Murray Decl. ¶ 5. As the CEO of two subsidiaries of IKAR, management roles pivotal to the regular business of IKAR, Ms. Murray was expected to work full-time, and worked an average of about 65 hours per week. *Id.* ¶¶ 5-7, 13. As part of her CEO responsibilities, she developed partnerships and strategies, negotiated business deals on IKAR's behalf, and represented IKAR in public forums. *Id.* ¶ 7. The Court should therefore find that Ms. Murray was an IKAR employee for the purpose of her Title VII claims.

> **v.  Ms. Murray states a claim for sexual harassment in violation of Title VII of the Civil Rights Act of 1964**

"California decisions construing FEHA parallel federal case law interpreting Title VII" in defining the hostile work environment and quid pro quo theories of sexual harassment liability. *Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1172 (9th Cir. 2001). *See also Doe v. Kijakazi*, No. 5:22-cv-00744-RGK-MW, 2023 WL 2628064, at *2, 3 (C.D. Cal. 2023) (stating analogous elements for a Title VII hostile work environment and quid pro quo sexual harassment claim as those required under FEHA). Therefore, the Court's analysis as to whether Ms. Murray states a sexual harassment claim under FEHA applies in the Title VII context. Applying the FEHA harassment analysis, *supra* Section II.B.ii, the court should find that Ms. Murray states a claim for sexual harassment in violation of Title VII.

> **vi.  Ms. Murray states a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964**

The elements of a retaliation claim under Title VII are identical to those required to state a FEHA retaliation claim. *Rasheed v. Foxx*, No. CV 14-7586 PSG (JPRx), 2016 WL 11745986, at *4 (C.D. Cal. Jun. 4, 2016) (articulating the same elements as described *supra* Section II.B.iii). As described in detail *supra* Section II.B.iii, Ms. Murray adequately alleges these same elements with respect to her FEHA retaliation claim. And like under FEHA, protected activity under Title VII includes opposition to and reports of behavior that a plaintiff reasonably believes as unlawful harassment under the Act. *Kilroy v. Los Angeles Unified Sch. Dist. Bd. Of Education*, No. CV 13-6373-DMG (FFMx), 2013 WL 12474266, at *2 (C.D. Cal. Sept. 24, 2013). Therefore, Ms. Murray states a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964.

## C. Factor 4: Plaintiff requests a reasonable sum of money

The fourth *Eitel* factor addresses whether the plaintiff's request for damages is reasonable "in relation to the seriousness of [the] Defendant's conduct." *Alabado*, 2016 WL 5929247, at *12 (internal citations and quotation marks omitted). Where a defendant employer in default has failed to provide documentation indicating the sum of money at stake, the court should "rely on the evidence provided by plaintiffs in evaluating their requests or damages and penalties." *Id.* a *12-13. In this matter, Ms. Murray seeks compensatory and punitive damages for each of her claims, as well as attorneys' fees.

### i. Backpay

Backpay is available to plaintiffs recovering for violations of FEHA and Title VII. *Andrade*, 225 F.Supp.3d at 1139. *See generally Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999). "'[T]he measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the

employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment.'" *Andrade*, 225 F.Supp.3d at 1140 (quoting *Mize–Kurzman v. Marin Cmty. Coll. Dist.*, 202 Cal.App.4th 832, 871 (2012)).

Effective January 3, 2022, Ms. Murray entered into a consultancy agreement with IKAR, in which her company, Attain 9, served as the "Lender" through which IKAR engaged Ms. Murray's services. *FAC* ¶ 19-20. Agreement. The Agreement specified the following provisions regarding compensation of Ms. Murray by IKAR:

> "**4.1.** Subject to the provision of Clause 4.2 of this Agreement, the Company shall pay to the Lender a monthly net Consultancy Fee in the amount of USD 20.000 against an invoice issued by the lender. The Parties accept and acknowledge that, the monthly net Consultancy Fee shall be adjusted and increased up to 20 % by mutual agreement of the Parties; (i) once all the operating expenses of the Company are secured, (ii) but not earlier than 2023.
>
> **4.2.** The Lender shall be entitled to the Consultancy Fee upon the injection of a minimum amount of USD 5.000.000 (five million American Dollars) or equivalent amount in any other currency investment to the Company by a third-party investor (s).
>
> **4.3.** The Lender shall be entitled to compensation earned between the Commencement Date and the date of injection of the funding amount as referenced in subparagraph 4.2 above, such funding to be secured within a reasonable period of time, but in no event shall Consultant work longer than six (6) months without compensation."

Agreement p. 6.

Ms. Murray worked full time and exclusively for IKAR from the Agreement's effective date, January 3, 2022, until the date of her termination on June 3, 2022. *FAC* ¶ 26. Murray Decl. ¶ 13. Termination Letter. She worked for IKAR at least 65 hours per week, provided Mr. Diel with daily progress reports, and spoke almost daily with Mr. Diel about IKAR-related business. *FAC* ¶ 26. Murray Decl. ¶¶ 6, 13.

However, IKAR has not provided Ms. Murray with any compensation for her services pursuant to the Agreement. *FAC* ¶ 61. Murray Decl. ¶ 14. IKAR also refused to pay the invoice that Ms. Murray's agent, Attain 9's Chief Financial Officer Frank Shepard, conveyed to IKAR via email on May 5, 2022, which requested compensation for Ms. Murray's first three months of work for IKAR. May 2022 Invoice, attached as *Exhibit D* to Murray Decl. *See also* Emails re Compensation, attached as *Exhibit E* to Murray Decl.

Ms. Murray is entitled to $186,000 in back pay. Pursuant to paragraph 4.1 of the Agreement, Ms. Murray is entitled to $20,000 for each month that she worked for IKAR. Agreement p. 6. Five months lapsed between the effective date of the Agreement on January 3, 2022 and the date that IKAR terminated the Agreement on June 3, 2022. Therefore, Ms. Murray is entitled to five months of backpay compensation pursuant to the Agreement, or $100,000. Ms. Murray is additionally entitled to backpay from the date of her termination until October 13, 2022, the date she commenced this lawsuit, Dkt. No. 1, or a period of 4.3 months, which amounts to $86,000.

Ms. Murray has diligently pursued efforts to seek alternative employment since her termination from IKAR, including applications to more than twelve companies and organizations. Murray Decl. ¶¶ 25-26. *See also* Selection of Job Outreach Efforts, attached as *Exhibit G* to Murray Decl. She has also interviewed for communications roles with election campaigns for two mayoral candidates in Philadelphia, Pennsylvania, and

has re-activated her license to practice law in Pennsylvania. Murray Decl. ¶ 26.

While paragraph 4.2 of the Agreement indicates that payment was conditional upon an investment of at least $5,000,000 into IKAR, paragraph 4.3 clarifies that she is entitled to compensation earned between the effective date of the Agreement and the date of any such investment. Agreement p. 6. Furthermore, Ms. Murray is aware that on or around March 17, 2022, IKAR received investment in the amount of €70,000,000. Murray Decl. ¶ 17. *See also* March 17, 2022 Press Release, attached as *Exhibit F* to Murray Decl. And Ms. Murray is aware that on or around May 31, 2022, all other IKAR CEOs except herself received an email from IKAR's Chief Financial Officer informing them that IKAR had received an infusion of cash and that payment was shortly forthcoming. *FAC* ¶ 55-56. Murray Decl. ¶ 18. Therefore, regardless of the condition in paragraph 4.2 of the Agreement, Ms. Murray is entitled to $186,000 in backpay.

### ii. Emotional distress

Damages for emotional distress are available to a plaintiff claiming harassment and retaliation under FEHA and Title VII. *See Andrade*, 225 F.Supp.3d at 1141 (emotional distress damages available for FEHA harassment claims); *Alabado*, 2016 WL 5929247, at *13 (emotional distress damages available for FEHA retaliation claims); *Ahlmeyer v. Nevada Sys. of Higher Educ.*, 555 F.3d 1051, 1059 (9th Cir. 2009) (noting that the Civil Rights Act of 1991 "made available compensatory damages for emotional pain and suffering" under Title VII); 42 U.S.C. § 1981a(a)(1). For claims under FEHA, "[c]ompensable emotional distress runs the full gamut of intangible mental suffering, including ... fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." *Murillo v. Rite Stuff Foods, Inc.*, 65

Cal.App.4th 833, 848 (1998) (internal citations and quotation marks omitted).

As a result of IKAR's unlawful conduct, Ms. Murray suffered great emotional distress for which she is entitled to recover damages. She experiences frequent flashbacks to Mr. Diel's unrelenting sexual advances and belittling disregard for her rejections and autonomy. Murray Decl. ¶¶ 19-20. During these flashbacks, Ms. Murray experiences panic and a rapid heartbeat, and she succumbs to tears. *Id.* ¶ 20. As the sole Black and female group CEO at IKAR, Ms. Murray felt uniquely vulnerable. *Id.* She felt, and continues to feel, belittled by Diel's disregard for her repeated rejections of his advances, and upset by how her male colleagues who observed the harassment refused to intervene or express disapproval. *Id.*

Ms. Murray is additionally affected by the fact that IKAR leadership failed to take any corrective action in response to her reports of Diel's harassing behavior. *Id.* ¶ 21. To her knowledge, the only action taken by IKAR in response to her reports of Diel's harassing behavior was to terminate her consulting contract. *Id.*

The June 3, 2022 Termination Letter is itself a source of emotional pain and suffering for Ms. Murray. *Id.* ¶ 22. It confirmed her worst fears: that her complaint of Diel's sexually harassing behavior towards her would be construed as an attack on her own character as deceitful and manipulative. *Id.*

As a result of Diel's sexually harassing behavior towards Ms. Murray and IKAR's response to her complaint of that behavior, including her termination without compensation for services already rendered, Ms. Murray experienced feelings of low self-esteem, insecurity, and a loss of confidence. *Id.* ¶ 23. She suffered from self-isolation, as a result of fear of forming vulnerable or romantic relationships. *Id.* These psychological symptoms

persist to this day, and have resulted in the physical symptom of weight gain. *Id.*

Finally, the financial strain of IKAR's conduct forced Ms. Murray to move into her parents' home. *Id.* ¶ 24. Living with her parents has compounded her psychological injuries and caused her to suffer from feelings of humiliation, helplessness, and shame. *Id.* Having to live with her parents has also strained her family relationships and negatively altered her social life. *Id.* The financial strain has also prevented Ms. Murray from engaging in psychotherapy services to treat her psychological and emotional injuries. *Id.*

Based on these emotional and psychological injuries, Ms. Murray is entitled to monetary damages in the amount of $250,000. Such an award is commensurate with cases alleging similar claims and emotional injuries. *See, e.g.*, *Iwekaogwu v. City of Los Angeles*, 75 Cal.App.4th 803, 821 (1999) (finding that an award of over $450,000 in emotional distress damages in a FEHA retaliation case was not excessive); *Alabado*, 2016 WL 5929247, at *13 (finding an award of $250,000 in emotional distress damages per plaintiff alleging FEHA retaliation claims was appropriate).

### iii.    Punitive damages

Punitive damages are available under FEHA and Title VII. *Andrade*, 225 F.Supp.3d at 1142 ("Punitive damages may also be obtained for violations of FEHA"). *Ahlmeyer,* 555 F.3d at 1059 (noting that the Civil Rights Act of 1991 made punitive damages available under Title VII); 42 U.S.C. § 1981a(a)(1).

Under FEHA, punitive damages are available "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "Malice" is "conduct which is intended by the defendant to cause injury to the plaintiff

or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). Additionally, a corporate employer can be liable for punitive damages based on an employee's acts if the employer, through an officer, director, or managing agent "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." *Id.* § 3294(b).

Under Title VII, punitive damages are available if the plaintiff demonstrates that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

Punitive damages against IKAR are warranted, because Ms. Murray has proffered clear and convincing evidence that IKAR acted with malice and reckless disregard for her rights under FEHA and Title VII when it terminated her consultancy contract less than three weeks after she reported Diel's harassing conduct to two of its officers, refused to compensate her in accordance with the Agreement, and threatened legal action against her for her lawful complaints about Mr. Diel:

- Ms. Murray's consultancy agreement with IKAR which, as described above, conveys the terms and conditions of her employment relationship with IKAR, including compensation. *See* Agreement;
- The declaration from Ms. Murray in which she corroborates the FAC's allegations regarding Mr. Diel's sexually harassing conduct and her report of this misconduct to two of IKAR's executive officers. *See* Murray Decl. ¶¶ 8-10;

- Ms. Murray's email to Mr. Thurgood and Mr. Mehas on May 17, 2022, officers of IKAR, in which she provided written notice to IKAR of Mr. Diel's harassing conduct towards her. *See* <u>May 17 Email</u>, attached as *Exhibit B* to Murray Decl.;
- The Murray Decl., ¶¶ 2-4, 13-18; the <u>Agreement</u>; the <u>May 2022 Invoice;</u> and the <u>Emails re Compensation;</u> which together demonstrate the FAC allegations that Ms. Murray is entitled to compensation for her work performed for IKAR but has not received any compensation to date;
- The declaration from Ms. Murray in which she corroborates the FAC allegations that she "is not aware of any investigative or corrective action taken by IKAR in response to" her report of Mr. Diel's behavior. Murray Decl. ¶ 11;
- The June 3, 2022 Termination Letter from Mr. Diel, on behalf of IKAR, which accused her of making "false statements and accusations" "with a false motivation of defaming and calumniating IKAR and its top management," and threatened legal action against her. *See* <u>Termination Letter</u>.

This conduct constitutes malice on the part of IKAR in its own capacity. IKAR is additionally subject to punitive damages under FEHA because it has – through its failure to take corrective action in response to Ms. Murray's complaint of harassment and the June 3, 2022 Termination Letter – authorized or ratified Mr. Diel's unlawful conduct. *See Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781, 815 (N.D. Cal. 2015) ("Whether a corporate employer has ratified an act may be established by any circumstantial or direct evidence demonstrating adoption or approval of the employee's actions by the corporate agent, which may be inferred from a failure by the employer to investigate an employee's acts once the employer

has become aware of them."). The evidence proffered by Ms. Murray entitles her to punitive damages under Title VII by demonstrating, at the very least, that IKAR acted with reckless indifference to her rights to be protected from discrimination. Accordingly, Ms. Murray is entitled to punitive damages.

The Court should award Ms. Murray punitive damages amounting to $4,360,000. *See, e.g., Weeks v. Baker & McKenzie*, 63 Cal.App.4[th] 1128 (1998) (affirming punitive damages award of $3.5 million against law firm whose partner sexually harassed secretary); *Wysinger v. Automobile Club of Southern California*, 157 Cal.App.4[th] 413 (2007) (punitive damages award of $1 million appropriate for FEHA discrimination claim); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994) (affirming punitive damages award for sex discrimination under FEHA and Title VII of $833,434.80).

### iv.    Attorney's fees

Attorney's fees are available to FEHA and Title VII plaintiffs. *Andrade*, 225 F.Supp.3d at 1143. 42 U.S.C. § 2000e-5(k). "Courts use the lodestar — the product of reasonable hours times a reasonable rate—to calculate attorney's fees." *Woodhouse v. United States Government*, No. 2:22-cv-00079-RGK, 2022 WL 17222248, at *1 (C.D. Cal. Aug. 16, 2022) (internal quotation marks omitted). "There is a strong presumption that the lodestar represents a reasonable fee." *Id*. The reasonable market rate for an attorney's services depends on the place where the court is located. *Gentile v. Cohodes*, No. A161721, 2021 WL 4946964, at *3 (Cal. Ct. App. Oct. 21, 2021).

Two attorneys for Plaintiff, through C.A. Goldberg, PLLC, have recorded a combined total of 94.78 hours working on Ms. Murray's case: Partner Aurore DeCarlo, Esq., and Associate Hannah Meropol, Esq. Meropol Decl. ¶ 8. Although C.A. Goldberg, PLLC has a contingency

agreement with Ms. Murray governing attorneys' fees, Ms. DeCarlo's normal hourly rate is $750, and Ms. Meropol's normal hourly rate is $475. Declaration of Aurore DeCarlo in Support of Plaintiff Seanne Murray's Motion for Default Judgment ("DeCarlo Decl.") ¶ 4-6. Meropol Declaration ¶ 9. Ms. DeCarlo has practiced law for 20 years and Ms. Meropol has practiced law for 1.5 years. DeCarlo Declaration ¶ 3. Meropol Declaration ¶ 6.

To date, Ms. Meropol has recorded 67.98 hours of work on the matter, and Ms. DeCarlo has recorded 26.8 hours of work on the matter. Meropol Decl. ¶ 8. This combined work has included counseling Ms. Murray, reviewing evidence, conducting legal research to analyze Ms. Murray's claims, drafting the pleadings, pursuing service of process for foreign defendants, and drafting the instant motion. Meropol Decl. ¶ 8.

The hourly rates charged by Ms. DeCarlo and Ms. Meropol are commensurate with prevailing rates in the Los Angeles region. Meropol Decl. 9. DeCarlo Decl. ¶ 6. *Pierce v. County of Orange*, 905 F.Supp.2d 1017, 1035 (C.D. Cal. 2012) (finding hourly rates ranging from $450 to $825 for civil rights attorneys to be reasonable for Southern California law firms); *Notorious B.I.G. v. Yes. Snowboards*, No. CV 19-1946-JAK (KSx), 2020 WL 6154195, at *4 (C.D. Cal. Sept. 18, 2020) (finding an hourly rate of $450 was reasonable for a Los Angeles-based associate with four years of experience in civil litigation).

Moreover, "[t]he existence of a contingency fee arrangement favors awarding to counsel the requested value of their services, because counsel accepted the case with the possibility that he might not receive compensation." *Partners for Health and Home, L.P. v. Seung Wee Yang*, 488 B.R. 431, 438 (C.D. Cal. 2012); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (reasoning that civil rights lawyers "are not

likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees… the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case.").

Multiplying the hours worked by each attorney's hourly rate, Ms. Murray requests an award of attorney's fees amounting to $52,390.50. The Court should find that this requested attorney's fee, which is a result of the lodestar method, is reasonable.

## D. Factor 5: There is little possibility of a dispute concerning material facts

Since IKAR has failed to respond or appear in this matter despite having the opportunity to do so after being served with the FAC and summons, as well as Plaintiff's Request for Entry of Default, Dkt. No. 23, there is no present dispute concerning the material facts alleged in the FAC. Additionally, "[b]ecause of the need for finality in this case, and [IKAR's] refusal to participate in the judicial process… the danger of a future dispute as to material facts is outweighed by the need to enter judgment." *Andrade*, 225 F.Supp.3d at 1137. This factor thus weighs in favor of the entry of default judgment against IKAR.

## E. Factor 6: IKAR's default was not due to excusable neglect

For similar reasons, the court should also find that IKAR's default was not due to excusable neglect. IKAR was properly served with the FAC and summons in this matter, but failed to respond within the time allowed by the Federal Rules of Civil Procedure. *See* Dkt. No. 26 (entry of default against IKAR). IKAR was also served with Plaintiff's Request for Entry of Default, Dkt. No. 23, but still declined to respond or otherwise appear in this matter. "There is no evidence in the record that [IKAR has] failed to defend

this action due to excusable neglect. Thus, this factor weighs in favor of default judgment." *Alabado*, 2016 WL 5929247, at \*18.

## F. Factor 7: A decision on the merits is impossible given IKAR's failure to respond or appear in this matter

"[A]lthough federal policy generally favors decision on the merits, Federal Rule of Civil Procedure 55(b) allows entry of default judgment in situations where the defendant refuses to participate in the litigation. *Andrade*, 225 F.Supp.3d at 1137. Such is the case here, *see supra* Section II.E, and thus this factor weighs in favor of the entry of default.

## CONCLUSION

For the reasons stated herein, the Court should grant Ms. Murray's Motion for Default Judgment against IKAR and award her compensatory damages, punitive damages, and attorneys' fees. Alternatively, the Court should grant Ms. Murray leave to submit additional briefing to justify the entry of default judgment.

Dated: June 6, 2023.

**C.A. Goldberg, PLLC**

By:  */s/ Hannah Meropol*
Hannah Meropol, CA Bar No. 340095
*Attorney for Plaintiff Seanne Murray*

# **CERTIFICATE OF COMPLAINCE**

The undersigned, counsel for Plaintiff SEANNE MURRAY, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 6, 2023.

*/s/ Hannah Meropol*
Hannah Meropol

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

SEANNE MURRAY, an individual,

        Plaintiff,

      vs.

MARIO DIEL, an individual; and
IKAR HOLDINGS LIMITED, a UK
company,

        Defendants.

**Case. No.:** 2:22-cv-07473 SB (KSx)

**PROOF OF SERVICE**

     I am employed in the county of Kings, State of New York. I am over the age of eighteen years and not a party to the within action; my business address is 16 Court St., 33rd Floor, New York, NY 11241.

On June 6, 2023, I served the following documents:

- PLAINTIFF SEANNE MURRAY'S MOTION FOR DEFAULT JUDGMENT
- DECLARATION OF HANNAH MEROPOL IN SUPPORT OF PLAINTIFF SEANNE MURRAY'S MOTION FOR DEFAULT JUDGMENT
- DECLARATION OF AURORE DECARLO IN SUPPORT OF PLAINTIFF SEANNE MURRAY'S MOTION FOR DEFAULT JUDGMENT
- DECLARATION OF SEANNE MURRAY IN SUPPORT OF HER MOTION FOR DEFAULT JUDGMENT

1

- [PROPOSED] ORDER GRANTING PLAINTIFF SEANNE MURRAY'S MOTION FOR DEFAULT JUDGMENT

I served the above listed documents by international registered mail pursuant to Fed. R. Civ. P. 5(b)(2)(C). Specifically, I sent the above listed documents via Federal Express International Priority mail, to Defendant IKAR HOLDINGS LIMITED at its registered office address, Birchin Court, 20 Birchin Lane, EC3V3DJ London, United Kingdom.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 6, 2023 in Union County, New Jersey.

By:    */s/ Amna Khalid*
       Amna Khalid